(291 P.3d 512)
No. 105,834

STATE OF KANSAS, *Appellee*, v. MONICA FELICE RIVERA,
*Appellant*.

Opinion filed December 21, 2012.

*Carl Folsom, III*, of Bell Folsom, P.A., of Lawrence, for appellant.

*Cheryl A. Marquardt*, assistant county attorney, *Todd L. Thompson*, county attorney, and *Derek Schmidt*, attorney general, for appellee.

Before GREEN, P.J., MARQUARDT, J., and BRAZIL, S.J.

MARQUARDT, J.: Monica Felice Rivera appeals her jury convictions for involuntary manslaughter and child endangerment. Rivera alleges there was insufficient evidence to support her convictions and that both the State and the district court committed several errors prior to and during her trial that denied her the right to a fair trial. She claims that her convictions should be reversed as a matter of law. We affirm in part, reverse in part, and remand for a new trial.

## FACTS

On May 5, 2009, Rivera and her boyfriend, Jason Jones, took her 4-year-old son, G.R., to the Safe Kids Daycare (daycare). Kathy Harris, a daycare employee, saw bruising and swelling on the left side of G.R.'s head. G.R. told Harris that he had been hit by a ball and that a doctor had taken a picture of his head. Rivera spoke to

Ms. Renee, another daycare employee, and told her to take extra special care of G.R. because of the bruising and swelling on the one side of G.R.'s face.

Rivera testified that the bruising and swelling on G.R.'s face occurred in two separate incidents. The first incident occurred on April 29, when G.R. was standing on a stool in the kitchen and suddenly fell and struck his head. Rivera testified that G.R.'s head "bounced back and forth like three times" and he sustained a "goose egg" on his head. According to Rivera, the second incident occurred on May 2, when G.R. was hit in the head by a soccer ball and then collided with another player.

While at daycare on May 5, G.R. fell off a swing. Harris noticed that G.R. suffered a small scratch on his back. Rivera was notified that G.R. had fallen off the swing, but she testified that after G.R.'s fall from the swing, he had a big scrape and a big bruise on the bottom of his back. The following day, Rivera testified that G.R. hit his head against the corner of a countertop while he was reaching for his glasses. When Jones left G.R. at daycare that morning, Harris reported that G.R. was crying and complaining that his head hurt and said that he had hit his head on a cabinet. Harris testified that G.R. appeared to have more swelling and bruising and that his injuries were more black, red, and purple than they were the previous day.

Toni Cox, Rivera's older sister, testified that Rivera brought G.R. to her house on two separate occasions to make sure that G.R. was okay. On the first visit, Cox testified that she observed a large knot with swelling and bruising on the side of G.R.'s head. Cox advised Rivera to take G.R. to the hospital to get X-rays or a CT scan. Rivera testified that she took G.R. to an emergency room and was told that the injury to G.R.'s head would probably cause G.R. to have a black eye. During the second visit, Cox reported that the swelling and bruising on G.R.'s face appeared to have shifted to the front of his face and that it appeared that the injury had gotten larger. Cox testified that she became concerned that someone was possibly physically abusing G.R., and she specifically asked Rivera to not allow Jones to discipline G.R. Cox testified that Rivera stated she

was going to allow Jones to continue disciplining G.R. because G.R. acted better now.

On May 7, Rivera took G.R. to see Dr. Debra Heidgen, a pediatrician, who observed bruising and a lot of swelling and diagnosed G.R. as having a hematoma on his head. Dr. Heidgen testified that the injury was more than a simple surface bruise and involved the top layer of the bone. Dr. Heidgen also testified that she had seen G.R. in January 2009 and again on February 24, 2009. During both visits, she did not observe any injuries to G.R. that raised concerns, but during the February appointment, she did note that G.R. suffered from contact dermatitis and had scratches and bumps on his body.

Sometime around the January appointment with Dr. Heidgen, Rivera began to have a concern about one of G.R.'s eyes. Rivera testified that G.R. had previously had surgery and was required to wear corrective eyewear. Rivera testified that while at a soccer game with G.R., she noticed that G.R.'s one eye turned out a lot more than normal. Rivera scheduled an appointment with G.R.'s eye doctor in May 2009, and she took G.R. to see a specialist at Children's Mercy Hospital. Rivera testified that the doctor at Children's Mercy did not believe that additional surgery was necessary but did change G.R.'s eyeglasses prescription.

Rivera testified that on May 8, 2009, G.R. fell while riding his scooter at Jones' parents' house, hit his head on some bricks, and got a big strawberry mark on his head. On May 11, Rivera did not take G.R. to daycare because he kept getting injured. She wanted G.R. to stay home and take it easy. On May 13, Rivera took G.R. to daycare again. Harris testified that after G.R. was dropped off, he complained to the daycare workers that his head hurt and that Jones had spanked him hard two times. Harris noted that G.R. appeared to have a new black eye that was purple, red, and swollen. Stephanie Dickerson, another daycare worker, testified that when she observed G.R., she noticed that he had bruising on his face, redness, and bloodshot veins in his eye. Dickerson testified that both Rivera and G.R. told her that G.R. had fallen trying to reach for an object on a dresser; however, G.R. also told the workers that Jones had done something to his eye. After hearing G.R.'s com-

plaints and observing the injuries to his face, the daycare workers decided to report suspected child abuse to the Kansas Department of Social and Rehabilitation Services (SRS).

Jennifer Beard, a detective with the Leavenworth Police Department, took G.R. into protective custody. Beard testified that she observed a softball sized bruise on the left side of G.R.'s head and lighter bruising around one of his eyes. Beard believed that the different coloration of the bruises indicated that the injuries occurred at different times. When Rivera returned to daycare later that day to pick up G.R., Beard told Rivera that she suspected Jones was abusing G.R. Beard also testified that she warned Rivera that if Jones continued to abuse G.R., G.R. would either be seriously injured or killed. Beard acknowledged that she failed to record notes from this conversation in her investigative report. Rivera testified that she did not remember Beard ever giving her that particular admonition.

Beard testified that when she asked G.R. about the source of his injuries, G.R. told her that he hurt his head when he fell off a stool. Beard also asked Rivera about G.R.'s injuries and stated that Rivera told her that G.R. had fallen off a stool, hit his head against a cabinet, and had been hit in the head by a soccer ball. Rivera testified that prior to G.R. being taken into protective custody, Jones had disciplined G.R. by swatting him on the butt a couple of times and that Jones would use his hand to discipline G.R. Rivera further testified that she had never witnessed Jones hit G.R. and that G.R. had never told her that Jones had beaten him or abused him.

While in protective custody, Beard took G.R. to Dr. Heidgen again, and during the examination, Dr. Heidgen observed new injuries on G.R.'s body around his eye; bruising, redness, and impressions resembling fingerprints on G.R.'s buttocks; marks and bruising on G.R.'s shoulder; and red finger marks on G.R.'s upper left arm. Although Dr. Heidgen was unable to conclusively determine what caused the particular bruising, she testified that the injuries on G.R.'s body were not consistent with injuries that a child normally sustains in a fall. Dr. Heidgen testified that she examined

G.R. the following day and noted that the coloring of his bruises had turned from red to a darker purple color.

On May 15, 2009, the Leavenworth County District Court entered an ex parte order placing G.R. in SRS custody and entering a restraining order preventing Jones from having any contact with G.R. On May 20, the district court held a temporary custody hearing. At this hearing, the State of Kansas was represented by Cheryl Marquardt; E. Roger Horsky was G.R.'s guardian ad litem; and Rivera was represented by Michael Willcott. Rivera testified that G.R. had collided with another player while playing soccer. She also testified that prior to the child-in-need-of-care (CINC) case, the only forms of discipline G.R. received were swats and time-outs, but after the CINC case was filed, Rivera and Jones stopped using corporal punishment and only used time-outs. At the conclusion of the temporary custody hearing, the district court ordered G.R. to remain in SRS custody and Jones to have no contact with G.R. The district court also ordered Rivera to have unrestricted visitation with G.R. at her sister's house. SRS was ordered to prepare a safety plan, and once the court approved the safety plan, SRS had the discretion to place G.R. with Rivera.

After the temporary custody hearing, SRS placed G.R. in Cox' home. While G.R. stayed at Cox' home, G.R. fell down the stairs twice and also fell off his bicycle. Cox testified that G.R. moved fast wherever he went, that she often had to tell him to slow down, and that G.R. suffered from equilibrium problems. Cox maintained that G.R.'s falls while he was in her custody were not the product of G.R.'s coordination deficiencies but were caused by the recent injuries he had suffered. In addition to G.R.'s coordination deficiencies, Rivera explained that Cox spoiled G.R. and that G.R. would throw temper tantrums and throw his glasses when he was angry. Sherry Bridget and Tonya Jacobs, employees of the Leavenworth County Head Start Program, observed G.R. and noted that he had behavioral issues. Jacobs testified that she was G.R.'s teacher from December 2008 to May 2009, that G.R. would throw temper tantrums and get angry, that she never observed any injuries on G.R. that caused her any concern, and that she never heard G.R. complain of any injuries.

On June 7, Rivera testified that G.R. injured himself after he climbed up on his dresser to reach a television and the dresser tipped over. Rivera testified that she took pictures of G.R.'s injuries to provide documentation to SRS while G.R.'s CINC case was still pending. Two days later, SRS placed G.R. back in Rivera's home. That same day, Rivera took G.R. into Head Start to sign a release form. Shannon Hudson, an employee of Head Start, observed that G.R. had several cuts and bruises and had blood in his eye from what appeared to be a broken blood vessel. On June 23, Rivera testified that G.R. received a broken lip after he ran into a pole at Wal-Mart. Rivera further testified that on another occasion, G.R. fell out of his bed and hit the side of his head against a toy tractor.

When SRS placed G.R. back in Rivera's home on June 9, the district court's order that Jones was not to have any contact with G.R. was still in effect. On July 9, Rivera and Jones participated in the following exchange of text messages:

"Rivera: I really think u need to control your temper differently"

"Jones: U know im trying with [G.R.] but u make me fell [*sic*] like im always wrong"

"Rivera: I think breakng [*sic*] his toys was wrong. sometimes you go too far."

The following day, Rivera and Jones exchanged the following text messages:

"Jones: Another day another arugment [*sic*] about [G.R.]"

"Rivera: I'm not gonna have u loose [*sic*] your temper n hurt him or break his toys because u can't control your temper n u get mad at me n take it out on him."

On July 20, the district court held a CINC hearing in which the parties were represented by the same attorneys who appeared at the temporary custody hearing. At this hearing, the State advised the district court that the State believed it was in G.R.'s and the family's best interests for the court to approve an informal supervision agreement. Under the terms of the informal supervision agreement, G.R. was released from SRS custody and was placed back in Rivera's custody, Rivera and Jones were required to complete a parenting class, Jones was required to complete a counseling intake to determine what counseling services he would be required to attend, and the no-contact order preventing Jones from

having any contact with G.R. was eliminated. Both Willcott and Horsky joined in the State's recommendation for the court to approve the informal supervision plan. The district court approved the informal supervision agreement.

Rivera's sister, Samantha, testified that in August 2009, one of Jones' children put a rope around G.R.'s neck and walked him around like he was a dog on a leash. Samantha testified that this particular incident resulted in G.R. getting a red mark around his neck. Samantha further testified that G.R. and the other children in the family would often ride around in little four-wheel scooters and crash into one another. She explained that the crashes would result in the kids suffering scrapes and bruises and that the crashes occurred quite frequently. Samantha also testified that she never saw Jones physically abuse G.R. and did not observe anything suspicious that would cause her to believe that Jones was abusing G.R.

On September 16, Rivera accompanied Jones to the Guidance Center to complete Jones' court-ordered counseling intake. The assessment recommended that Jones participate in individual therapy and continue attending a parenting class. The assessment did not recommend that Jones participate in an anger management class. Both Rivera and Jones successfully completed their parenting classes.

On October 1, Rivera was working at St. John's Hospital when she received a phone call from Jones, advising that G.R. had fallen down the stairs. Rivera took a photograph of G.R.'s injuries on her phone and showed those photographs to Christina Debusk, a co-worker. Debusk testified that the photograph showed that G.R. was a little bit swollen and blue on his head.

On October 4, Rivera received another phone call from Jones while she was at work, in which Jones advised that G.R. had fallen down the stairs again and Rivera needed to hurry home. When she got home, G.R. was lying on the couch and kept repeating, "I, I, I." Rivera believed that G.R. had suffered brain damage, and she decided to pick him up and drive him to the hospital. Rivera took G.R. to the hospital emergency room, where he was admitted to a trauma room for treatment. While administering treatment, Sandra Arneson, a hospital nurse, observed an injury to G.R.'s penis that

she felt was unusual. Arneson asked Rivera about the bruise to G.R.'s penis and was told that the bruise occurred after G.R. fell a few days earlier. Rivera also told Arneson that she was present when G.R. fell and had personally observed him fall.

While G.R. was still in the hospital's trauma room, Officer Joseph Tavano of the Leavenworth Police Department spoke with Rivera about G.R.'s injuries. Rivera told Tavano that G.R. had fallen down the steps the previous Thursday while she was at home. She also told Tavano that she did not see G.R. fall but heard him fall. Shortly after Rivera told Tavano this information, she sent Jones a text message stating, "I told the officer I was with him the other day when he fell."

Approximately an hour and a half after G.R. was brought to the hospital, he died. After G.R. died, Detective Beard went to the hospital's trauma room to photograph G.R.'s body. Beard observed a looping bruise on the left side of G.R.'s face and pattern bruising consistent with fingertip impressions. Beard testified that the looping bruise on G.R.'s face was a pattern bruise that was consistent with the shape of a flyswatter that was located in the living room of Rivera's house.

G.R.'s autopsy revealed that he died of blunt force injuries to his head and abdomen. The autopsy report noted that G.R. suffered a vertical transecting laceration in his liver, acute hemorrhages in his right adrenal gland and multiple lung lobes, and a branched fracture in his posterior skull. The autopsy report also noted that G.R. suffered extensive and acute contusions and abrasions on his head, torso, and extremities.

During an interview with Leavenworth Police Department after G.R.'s death, Rivera told officers that she was in shock after G.R. died and that was the reason she told Tavano that she was with G.R. the Thursday before he died. Rivera also explained to the officers that the injuries G.R. sustained between October 1 and October 4 were from G.R. falling because that is what G.R. had told her. In response to an inquiry of whether Rivera had ever seen Jones go too far in disciplining G.R., Rivera told the officers of one incident in March when G.R. sustained bruising on his butt after he was spanked too hard by Jones. Rivera told the officers that

after this incident, Jones and Rivera decided that they would no longer use corporal punishment to discipline the children. Rivera also maintained that G.R. never told her about any physical abuse committed by Jones and that she never saw Jones physically abuse G.R.

Rivera knew that Jones had served time in prison for robbing a convenience store, but she maintained that Jones had never been abusive toward her, with the exception of the last 2 weeks of their relationship when he began to accuse her of cheating on him.

Liza Ruiz, who described herself as a close friend of Rivera, testified that she had previously been in a relationship with Jones and that Jones had physically abused her for approximately 8 or 9 years. She also testified that she shared two children with Jones and that on one occasion she observed Jones pick up and choke their 4-year-old son. Ruiz indicated that she had told Rivera about Jones' physically abusive behavior. Rivera testified that Ruiz had told her that she and Jones would argue and fight, but Rivera denied that Ruiz ever told her that Jones had physically abused either of their children.

After G.R.'s death, Jones pled guilty to one count of second-degree murder and one count of abuse of a child. At Rivera's trial, the State and Rivera agreed to stipulate that Jones had pled guilty to second-degree murder and abuse of a child. The State initially charged Rivera with one count of aggravated endangering a child but subsequently amended the complaint to charge Rivera with one count of involuntary manslaughter and one count of endangering a child.

Prior to trial, Rivera's counsel moved to disqualify the prosecutor, depose the prosecutor, dismiss the complaint for failure to charge a crime, and continue the trial. Rivera sought to disqualify the prosecutor in her criminal case and/or be granted the opportunity to depose the prosecutor because the prosecutor in the criminal case was the same prosecutor who represented the State in G.R.'s CINC case. Rivera alleged that the prosecutor was a material witness and possessed potentially exculpatory evidence that was important to Rivera's defense. The district court denied both of these requests.

In her motion to dismiss the complaint, Rivera alleged that the complaint was fatally defective because it did not include an essential element for the crime of endangering a child. The district court denied this motion. In her oral motion to continue the trial, Rivera argued that a continuance was justified because counsel required additional time (1) because of the short time between the preliminary hearing and the trial date; (2) to review newly discovered materials that were recently provided by the State; (3) to prepare a response to the testimony of witnesses who were recently endorsed at a pretrial hearing; (4) to send out subpoenas for SRS witnesses and obtain their cooperation to testify at trial; (5) to file new pretrial motions; and (6) to interview other witnesses involved in G.R.'s CINC case because the court had denied her request to depose the prosecutor or call the prosecutor as a witness at trial. The district court denied Rivera's motion for a continuance.

At a subsequent pretrial hearing, Rivera's counsel reiterated her reasons for asking for a continuance. In response, the district court asked Rivera's counsel if counsel was renewing her request for a continuance. Rivera's counsel never specifically answered the question but repeatedly stated that the defense was as prepared as they could be to proceed to trial under the strict constraints imposed by the district court.

On the morning of trial, the district court held a conference with Rivera's counsel and the State to discuss some preliminary instructions that the court intended to give to the jury prior to the start of trial. The district court advised counsel for both parties that it intended to give a preliminary instruction on involuntary manslaughter and would instruct the jury as follows:

"The defendant is charged of the crime involuntary manslaughter. The defendant pleads not guilty. To establish this charge, each of the following claims must be proved:

"[One,] [t]hat Jason Jones unintentionally killed [G.R.];

"Two, that it was done while in the commission of endangering a child, and

"Three, that this act occurred on or about the 4th day of October, 2009, in Leavenworth County, Kansas."

The State did not oppose this proposed preliminary instruction, but Rivera's counsel objected to it.

Prior to the beginning of trial, the district court read the preliminary instructions to the jury, including the preliminary instruction on involuntary manslaughter. The district court also advised the jury that it would give the jury a set of final instructions, that those final instructions might define one or more less serious crimes, and that the court might provide the jury with additional instructions as necessary. The district court also advised the jury that the final instructions would be read to the jury after all of the evidence had been submitted.

At the conclusion of the presentation of all of the evidence, the district court and both counsel participated in the instructions conference. During this conference, Rivera's counsel requested that the district court give the standard PIK instruction for involuntary manslaughter; the State did not object. Rivera's counsel also requested that the district court issue a curative instruction to eliminate any confusion that could arise due to the differences between the PIK instruction and the district court's preliminary instruction on involuntary manslaughter. The district court denied this request. When the district court issued its final jury instructions, the PIK instruction for involuntary manslaughter was included. The jury convicted Rivera of involuntary manslaughter and endangering a child. Rivera timely filed her notice of appeal.

### SUFFICIENCY OF THE EVIDENCE FOR AN INVOLUNTARY MANSLAUGHTER CONVICTION

When the sufficiency of the evidence is challenged in a criminal case, the standard of review is whether, after review of all the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt. *State v. McCaslin*, 291 Kan. 697, 710, 245 P.3d 1030 (2011).

Rivera argues that the State presented insufficient evidence to prove that she left G.R. in the care of Jones and that doing so was the proximate cause of G.R.'s death. Rivera further argues that her conviction for involuntary manslaughter must be reversed because the case against her was wholly circumstantial, and in order to find her guilty of involuntary manslaughter, the jury was required to

stack inference upon inference to conclude that she involuntarily killed G.R. by leaving him in Jones' care.

The State charged Rivera with involuntary manslaughter under K.S.A. 21-3404(b), which proscribes the unintentional killing of a human being committed "in the commission of, or attempt to commit, or flight from . . . a misdemeanor that is enacted for the protection of human life or safety, including acts described in K.S.A. 8-1566 and subsection (a) of 8-1568, and amendments thereto, but excluding the acts described in K.S.A. 8-1567 and amendments thereto." In the complaint, the State alleged that Rivera committed the misdemeanor of endangering a child and that this misdemeanor was enacted for the protection of human life or safety, which adequately supported the involuntary manslaughter charge.

Rivera argues that "[u]nder the circumstances, Mr. Jones' killing of G.R. was an intervening event that caused the death of G.R. While it may have been foreseeable that some harm might occur to G.R. in the care of Mr. Jones, there was insufficient evidence that Ms. Rivera's actions were the proximate cause of G.R.'s death."

In order to convict a defendant of involuntary manslaughter, the State must prove that the defendant's conduct was the proximate cause of the victim's death. *State v. Scott*, 285 Kan. 366, 372, 171 P.3d 639 (2007). "Proximate cause is cause which in natural and continuous sequence, unbroken by an efficient intervening cause, produces the injury, and without which the injury would not have occurred, the injury being the natural and probable consequences of the wrongful act." *Kuxhausen v. Tillman Partners*, 291 Kan. 314, Syl. ¶ 6, 241 P.3d 75 (2010).

In *State v. Davidson*, 267 Kan. 667, 987 P.2d 335 (1999), Davidson was convicted of reckless second-degree murder after Davidson's three Rottweilers escaped from their enclosure and killed a young child. At trial, the State presented considerable evidence demonstrating that Davidson's Rottweilers exhibited vicious propensities, regularly roamed at large outside of their enclosure, and had threatened or bitten numerous neighbors and guests. Additionally, Davidson had been told about these incidents and had been warned about possible adverse consequences if she failed to

take remedial action. In order to convict Davidson of reckless second-degree murder, our Supreme Court concluded:

"The State is not required to prove that defendant knew her dogs would attack and kill someone. It was sufficient to prove that her dogs killed Chris and that she could have reasonably foreseen that the dogs could attack or injure someone as a result of what she did or failed to do." *Davidson*, 267 Kan. at 683.

The *Davidson* court held that when the evidence is viewed in the light most favorable to the State, it showed that Davidson created an unreasonable risk and that it could be inferred from her conscious disregard of that risk that she demonstrated an extreme indifference to the value of human life. *Davidson*, 267 Kan. at 684.

Although Rivera was charged with the less serious crime of involuntary manslaughter, the analysis in *Davidson* is nonetheless applicable in resolving her claim that the State did not present sufficient evidence to show that her leaving G.R. in Jones' care was the proximate cause of G.R.'s death. In order to convict Rivera of involuntary manslaughter, the State was required to prove that Jones killed G.R. and that Rivera could have reasonably foreseen that Jones could injure G.R. while G.R. was left alone in Jones' care. The first requirement is satisfied because Rivera stipulated that Jones pled guilty to reckless second-degree murder for killing G.R. The second requirement is also met because Rivera concedes in her brief that "it may have been foreseeable that some harm might occur to G.R. in the care of Mr. Jones." Thus, Rivera's concessions and stipulations provide sufficient evidence to support her conviction of involuntary manslaughter.

The State presented evidence that G.R.'s daycare worker, law enforcement officials, G.R.'s pediatrician, and even members of Rivera's own family had concerns that G.R. was being abused or that Jones should not be permitted to discipline G.R. for fear that he would go too far. There was testimony and photographic evidence describing G.R.'s numerous bruises and injuries to his face, body, and extremities. The State also presented text messages between Rivera and Jones in which Rivera mentions that Jones had broken G.R.'s toys, that she did not want Jones to direct his anger against her towards G.R., and that she was not going to allow Jones

to lose his temper and hurt G.R. There was also evidence that showed that on the day of his death, G.R. had a large looping bruise on the left side of his face, and Detective Beard testified that the shape of this bruise was consistent with the shape of the handle of a flyswatter that was found in Rivera's home. When G.R. was brought to the hospital on October 4, Arneson noticed a suspicious bruise on G.R.'s penis, and she asked Rivera about the origin of the bruise. Rivera told Arneson that G.R. received the bruise when he fell down the previous Thursday and that she was with G.R. when he fell. However, Rivera later admitted that this statement was not true, as she was at work that day and it was Jones who had told her that G.R. had fallen down the stairs. Finally, Liza Ruiz testified that Jones had physically abused her as well as one of her children and that she had told Rivera about this abuse.

Rivera disputed virtually all of this evidence and argued at trial that G.R.'s injuries were the product of accidents, aggressive child's play, G.R.'s coordination difficulties, and a byproduct of G.R.'s eye condition. The State and Rivera presented evidence to support two competing and conflicting narratives, and it is apparent that the jury disagreed with Rivera's explanation of G.R.'s injuries and found that G.R.'s injuries were caused by Jones' physical abuse. It is not the function of an appellate court to reweigh the evidence, pass on the credibility of witnesses, or resolve conflicts in the evidence, as these tasks are uniquely entrusted to the jury. *State v. Pham*, 281 Kan. 1227, 1252, 136 P.3d 919 (2006). Therefore, the testimony and photographs presented at trial provided sufficient evidence upon which a rational factfinder could rely to find that Rivera could have reasonably foreseen that Jones could injure G.R. while G.R. was left alone in Jones' care.

Equally unpersuasive is Rivera's argument that there was insufficient evidence to support her involuntary manslaughter conviction because the jury was required to stack inference upon inference in order to convict her of that crime. The text message conversations between Rivera and Jones provide direct evidence that Rivera knew that Jones posed at least some risk to G.R.'s physical well-being. Furthermore, there was evidence that Rivera was told about prior incidents in which Jones had become physically

violent with his prior girlfriend and one of his children. Finally, the jury heard testimony and saw photographs describing all of the bruising and injuries that G.R. had suffered over approximately a 5-month period. It was for the jury to decide whether G.R.'s injuries were caused by accidents and child's play or whether they were caused by physical abuse. See *Krentz v. Haney*, 187 Kan. 428, 432, 357 P.2d 793 (1960). Based on the witness testimony and the photographic evidence admitted at trial, it was not unreasonable for the jury to infer that G.R.'s injuries were the product of physical abuse committed by Jones and that Rivera knew or should have known about the abuse but ignored it. Therefore, there was sufficient evidence to support Rivera's conviction for involuntary manslaughter.

## PROSECUTOR'S DISQUALIFICATION OR BEING CALLED AS A DEFENSE WITNESS

A district court's decision on a motion to disqualify an attorney from handling a legal matter is reviewed for an abuse of discretion. *State v. Cope*, 30 Kan. App. 2d 893, 895, 50 P.3d 513, *rev. denied* 274 Kan. 1115 (2002). Interpretation of a statute is a question of law over which appellate courts have unlimited review. *State v. Arnett*, 290 Kan. 41, 47, 223 P.3d 780 (2010).

Prior to trial, Rivera filed a motion seeking to have the district court disqualify the prosecutor, or alternatively, she sought permission to depose the prosecutor or to call the prosecutor as a witness at trial. The district court denied Rivera's requests, and she asserts that the district court erred in doing so.

### Disqualification

Rivera argues that one of the prosecutors who handled her criminal case should have been disqualified from prosecuting the criminal case because that same prosecutor represented the State in G.R.'s CINC case. Rivera contends this prosecutor "had knowledge of the proceedings and facts involved with the CINC case, and she had given Ms. Rivera the message that it was safe for G.R. [to] have contact with Mr. Jones." Rivera further contends that the prosecutor's "decision to agree to lift the no-contact order was also

undoubtedly supported by some exculpatory information that was never made known to the defense."

"The key in deciding whether a prosecutor should be disqualified is whether the prosecutor has a significant personal interest in the litigation which would impair the prosecutor's obligation to act impartially toward both the State and the accused." *Cope*, 30 Kan. App. 2d at 897. In her motion to disqualify, Rivera never alleged that the prosecutor's handling of G.R.'s CINC case caused her to have a significant personal interest in Rivera's criminal case. Rather, Rivera asserted that the prosecutor's involvement in G.R.'s CINC case made her privy to potentially exculpatory information that the defense sought to acquire. Thus, Rivera failed to show that there was prosecutorial partiality warranting disqualification, and the district court did not abuse its discretion in denying Rivera's motion. See *State v. Shore*, No. 97,833, 2007 WL 4578005, at *11-12 (Kan. App. 2007) (unpublished opinion), *rev. denied* 286 Kan. 1185 (2008) (affirming the district court's denial of the defendant's motion to disqualify the prosecutor when the prosecutor represented the State in a previous CINC case involving both the defendant's brother and the victim).

*Deposing or Calling the Prosecutor as a Witness at Trial*

Similar to Rivera's argument for disqualifying the prosecutor, she argues that the district court erred in denying her request to depose the prosecutor or to call the prosecutor as a witness at trial because the prosecutor's involvement in G.R.'s CINC case made the prosecutor privy to information that Rivera believed was vital to her defense. Specifically, Rivera contends that the prosecutor's decision to recommend an informal supervision agreement in G.R.'s CINC case and the removal of the no-contact order was potentially exculpatory information. Rivera claimed this information showed that the State believed it was acceptable for Jones to resume living with Rivera and for Jones to have contact with G.R. Rivera desired to ascertain the prosecutor's motivation for making this recommendation, and to that end, she requested that the district court allow her to depose the prosecutor or call the prosecutor as a witness at trial.

Rivera notes that the legislature has specifically exempted judges (K.S.A. 60-442) and jurors (K.S.A. 60-443) from testifying in a case in which those persons are involved and has also recognized that a defendant has the privilege to refuse to testify in his or her own case (K.S.A. 60-423[a]), but she points out that there is no similar exclusion in the Kansas Rules of Evidence which excludes a prosecutor from being called as a witness in a case in which the prosecutor is personally participating. Although Rivera recognizes that there is no express rule preventing a party from calling a prosecutor as a witness in a case in which that prosecutor is personally participating, her argument nonetheless fails.

Our Supreme Court has "condemned as bad practice the participation by an attorney in the trial of a case, either criminal or civil, when he is called as a witness." *Holt v. State*, 202 Kan. 759, 763, 451 P.2d 221 (1969). Additionally, the Kansas Rules of Professional Conduct (KRPC) advise that, except as otherwise provided, "[a] lawyer shall not act as an advocate at a trial in which the lawyer is likely to be a necessary witness." KRPC 3.7(a) (2011 Kan. Ct. R. Annot. 576). Although these statements do not expressly declare that a prosecutor may not be called as a witness in a case in which the prosecutor is personally participating, they give some indication that the practice is disfavored.

In deciding a motion to disqualify an attorney when opposing counsel wishes to call that attorney as a witness, a court should consider: (1) whether it has been shown that the attorney would give evidence material to the determination of the issues being litigated; (2) whether the evidence could not be obtained elsewhere; and (3) whether the testimony would be prejudicial or potentially prejudicial to the testifying attorney's client. *National Bank of Andover, N.A. v. Aero Standard Tooling, Inc.*, 30 Kan. App. 2d 784, 792, 49 P.3d 547, *rev. denied* 274 Kan. 1113 (2002).

In this case, Rivera has failed to show that the prosecutor's deposition or trial testimony was necessary to her defense. First, the prosecutor's rationale and decision-making process for agreeing to an informal supervision agreement and dropping Jones' no-contact order was not material to the issues being litigated in the case. The main issue in the case was whether Rivera could have reasonably

foreseen that Jones could cause harm to G.R. when she left G.R. alone in Jones' care, not whether the prosecutor reasonably foresaw this possibility. Second, and even more significant, is the fact that Rivera was able to present the information she wished by other means. During the trial, both Willcott, Rivera's attorney during the CINC case, and Horsky, G.R.'s guardian ad litem, testified. Rivera's counsel had the opportunity to question these attorneys as to why the parties agreed to recommend the adoption of the informal supervision agreement and the removal of the no-contact order. In fact, Rivera's attorney posed this question to Horsky. Furthermore, Rivera also admitted a transcript of the July 20 CINC hearing. In that transcript, the prosecutor explains why the State was recommending the informal supervision agreement. Thus, Rivera has failed to show that the district court erred in denying her motion to depose the prosecutor or to call the prosecutor as a witness.

## PROSECUTORIAL MISCONDUCT

Appellate review of an allegation of prosecutorial misconduct requires a two-step analysis. First, the appellate court decides whether the comments were outside the wide latitude that the prosecutor is allowed in discussing the evidence. Second, if misconduct is found, the appellate court must determine whether the misconduct prejudiced the jury against the defendant and denied the defendant a fair trial. *State v. Bennington,* 293 Kan. 503, 530, 264 P.3d 440 (2011). A contemporaneous objection is not required to review a prosecutorial misconduct claim based on comments made during voir dire, opening argument, or closing argument. *State v. Anderson,* 294 Kan. 450, 461, 276 P.3d 200 (2012). If the defendant demonstrates that the State committed an error of constitutional magnitude, then the State must prove beyond a reasonable doubt that the error did not affect the defendant's substantial rights. *Anderson,* 294 Kan. at 461.

Rivera alleges that the prosecutor engaged in prosecutorial misconduct by making prejudicial comments to the jurors during both voir dire and by making two inappropriate comments during the prosecutor's rebuttal closing argument.

*Prosecutor's Statements During Voir Dire*

During voir dire, the prosecutor made the following statements to the potential jurors:

"Okay. Now, ladies and gentleman, the case has to be decided sometime. Are you able to respectfully listen to each other and reach a decision? Does anyone think that, well, maybe the evidence could be presented better a different day? Or maybe a different group of people might be better able to decide this case?"

Also during voir dire, the prosecutor asked a prospective juror whether he believed "that [he] would be able to put in the time and effort and energy necessary to actually reach a verdict?" Rivera contends that these comments constituted prosecutorial misconduct because they implied that a hung jury would somehow be a failure of the system. Rivera's argument is unpersuasive.

In *State v. Nguyen*, 285 Kan. 418, 435, 172 P.3d 1165 (2007), our Supreme Court affirmed that an instruction given by the district court advising the jury that "[l]ike all cases, it must be decided sometime" is not error.

Here, the prosecutor's statements and questions during voir dire essentially contained the content presented to jurors in a typical *Allen*-type instruction, similar to what was given in *Nguyen*. See *Allen v. United States*, 164 U.S. 492, 17 S. Ct. 154, 41 L. Ed. 528 (1896). If it is appropriate for a district court to make such a statement when giving a jury the final instructions before deliberations, then it is reasonable to conclude that a prosecutor is permitted to pose *Allen*-type questions and statements to the potential jurors during voir dire. Therefore, the prosecutor's statements did not exceed the wide latitude granted a prosecutor, and we find that this did not constitute prosecutorial misconduct.

*Prosecutor's Comments During Rebuttal Closing*

During closing argument, Rivera's counsel argued that the jury should acquit Rivera of the crimes charged because the attorneys and the district court in the CINC case all agreed that informal supervision was appropriate and agreed to drop the no-contact order preventing Jones from having contact with G.R. Rivera's counsel remarked that something happened around the time of the July 20, 2009, hearing to change everyone's mind, including the pros-

ecutor's, but that the defense was unable to find out what changed the prosecutor's mind because the defense could not call the prosecutor as a witness. During the rebuttal closing, the prosecutor responded to this argument with the following statements:

"Now, [let's] talk about the smoking guns, and those are Defendant's Exhibit B and C and P, and those are with the child-in-need-of-care case that everybody said it was safe, it was okay, it was legal, go ahead and let the—let Jason Jones the boyfriend of approximately eight months back into that home. It wasn't the Court who placed the boyfriend back in the home. It was Ms. Rivera who put that boyfriend back in the home.

"The order was it's okay to continue contact—you can have contact now July 20th of 2009, but where's the information coming from that SRS is relying on, that the Court is relying on, that the guardian ad litem is relying on, *that the State is relying on?* It's the mother. The mother who got up on the stand and said, He doesn't spank, don't worry about it; he swatted him once, but it was okay and we just use time-out.

. . . .

"What did the Court rely on? *What did everybody rely on in this case?* It's what the mother said, and what she said at that point wasn't accurate. SRS isn't in the home. KVC isn't in the home, CASA is not in the home. They're not living there every day. The Court is not in the home, *the State is not in the home*, the pediatrician is not in the home. Who's in the home? The mother. And the mother is the one that has the duty to protect that child." (Emphasis added.)

Rivera asserts that these statements constituted prosecutorial misconduct because the prosecutor, who was the same prosecutor who represented the State in G.R.'s CINC case, offered unsworn testimony by explaining to the jury the reasons why the State agreed to the informal supervision arrangement and the dropping of the no-contact order. Rivera contends that by making these statements "in the rebuttal closing argument instead of a pretrial deposition or as a witness at trial, the prosecutor gave the defense no opportunity to question her reasoning, question the facts supporting her reasoning, or even an opportunity to address the jury in closing argument as to her reasoning."

A prosecutor is not permitted to argue facts not in evidence during closing argument because such statements tend to make the prosecutor his or her own witness, offering unsworn testimony not subject to cross-examination. *State v. Huerta-Alvarez*, 291 Kan. 247, 263, 243 P.3d 326 (2010). In this case, the prosecutor's com-

ments to the jury were improper when she told the jury what the State relied upon in making its recommendations in G.R.'s CINC case. No evidence was presented at trial to explain what information the State considered in making its recommendations. The prosecutor's comments were outside the wide latitude afforded a prosecutor in discussing the evidence, and thus, the first prong of the prosecutorial misconduct analysis is satisfied.

After determining that a prosecutor's statements were improper, an appellate court considers whether the statements were harmless and whether the prosecutor's statements were so prejudicial that the defendant was denied his or her right to a fair trial. In analyzing this issue, a court considers three factors: (1) whether the misconduct was gross and flagrant; (2) whether the misconduct was motivated by ill will; and (3) whether the evidence was of such a direct and overwhelming nature that the misconduct would likely have had little weight in the mind of a juror. *State v. Marshall*, 294 Kan. 850, Syl. ¶ 3, 281 P.3d 1112 (2012); *State v. Sprung*, 294 Kan. 300, 313, 277 P.3d 1100 (2012).

First, in determining whether a prosecutor's conduct was gross and flagrant, a court considers whether the prosecutor repeated or emphasized the statement and whether the prosecutor's statement was an impromptu response to arguments made by defense counsel. *State v. Peppers*, 294 Kan. 377, 400, 276 P.3d 148 (2012). Here, the prosecutor only referred one time to the State's reliance on the information supplied by Rivera at the temporary custody hearing as the basis for the State's decision to support informal supervision and dropping the no-contact order. The prosecutor also made a similar reference to what "everybody" relied on in supporting these recommendations. However, this statement is not as objectionable because the jury heard testimony from Rivera's CINC attorney and G.R.'s guardian ad litem and reviewed court documents and a transcript from the July 20 CINC hearing. Therefore, there was some basis for arguing what the other attorneys and the court relied on in reaching the decisions in G.R.'s CINC case.

Second, in determining whether a prosecutor's conduct was motivated by ill will, a court considers whether the conduct was deliberate, repeated, or in apparent indifference to a court's ruling.

*Peppers*, 294 Kan. at 400. In this case, the prosecutor's objectionable statement to the information that the State relied upon in G.R.'s CINC case was made one time and was not done in violation of any court ruling. Furthermore, the prosecutor's comments were likely not deliberate but were made in response to an argument made by Rivera's counsel. Our Supreme Court has recognized that a statement made in response to a defense argument is a mitigating factor countering a conclusion that a prosecutor acted with ill will. *Marshall*, 294 Kan. at 862.

Finally, the third factor considers whether there was direct and overwhelming evidence such that the prosecutor's misconduct would have little weight in the minds of the jurors. Upon reviewing the record, there is no reasonable possibility that the prosecutor's statements affected the outcome of the trial. Based upon the testimony of Rivera's attorney in the CINC case, the testimony of G.R.'s guardian ad litem, the documents, and the transcript from the July 20 CINC case, the jury was fully informed that all of the attorneys and the court agreed that informal supervision was appropriate, that G.R. should be released from SRS custody, and that the no-contact order preventing Jones from having contact with G.R. should be lifted.

Rivera contends that the prosecutor improperly commented on the credibility of Rivera during rebuttal closing argument. Rivera argues that the prosecutor implied that Rivera's testimony at the temporary custody hearing was dishonest when she said, "He doesn't spank, don't worry about it; he swatted him once, but it was okay and we just use time-out." This statement conflicted with the admission that Rivera later made to law enforcement that Jones once spanked G.R. too hard and caused bruising to G.R.'s butt.

Our Supreme Court has held that a prosecutor is not permitted to comment on the credibility of a witness. *State v. Elnicki*, 279 Kan. 47, 60-64, 105 P.3d 1222 (2005). Here, the prosecutor's statements did not exceed the wide latitude afforded a prosecutor in discussing the evidence during closing argument. The prosecutor did not directly comment on Rivera's credibility but rather pointed out that Rivera's testimony at the CINC hearing was inconsistent with statements she later made to police. The State is permitted

during closing argument to point out inconsistencies in a defendant's statements in order to persuade the jury that a defendant's testimony is not believable. See *Elnicki*, 279 Kan. at 61-63.

Because Rivera has failed to prove that the prosecutor's statements during voir dire and closing arguments were improper, we find that Rivera was not prejudiced or deprived of the right to a fair trial.

### PRELIMINARY JURY INSTRUCTION

When a party has objected to a jury instruction at trial, an appellate court examines the instruction to determine whether it properly and fairly states the law as applied to the facts of the case and could not have reasonably misled the jury. In making this determination, an appellate court is required to consider the instructions as a whole and not isolate any one instruction. *State v. Appleby*, 289 Kan. 1017, 1059, 221 P.3d 525 (2009).

Rivera asserts that her convictions should be reversed and the case remanded for a new trial because the district court gave a preliminary instruction on the charge of involuntary manslaughter before the start of the trial that misstated the law and reasonably could have misled the jury into convicting her. The district court advised the jury that one of the elements that the State must prove was that "Jason Jones unintentionally killed [G.R.]." However, it was Rivera who was on trial for unintentionally killing G.R. Rivera's counsel objected to this instruction.

At the conclusion of all of the evidence, Rivera's counsel requested that the district court include the standard PIK instruction for involuntary manslaughter in the instructions submitted to the jury. The State agreed, and the PIK instruction was given. The final jury instruction advised the jury that in order to convict Rivera of involuntary manslaughter, the State must prove that "the defendant unintentionally killed [G.R.]"

There does not appear to be any Kansas case that addresses whether the giving of a preliminary jury instruction that misstates the law can be cured by the district court submitting the correct instruction to the jury at the end of the trial. Our Supreme Court has generally stated that preliminary instructions must properly

and fairly state the law as applied to the facts of the case and must not reasonably have been capable of misleading the jury. *State v. Cook*, 259 Kan. 370, 394, 913 P.2d 97 (1996).

The federal courts that have addressed this issue have held that a final jury instruction that correctly summarizes the law cures any prejudice caused by the giving of a legally inaccurate preliminary instruction so long as the trial judge explains to the jury at the time preliminary instructions are issued that the court will give the jury final jury instructions at the conclusion of the trial and that those instructions are controlling. *United States v. Hernandez*, 176 F.3d 719, 735 n.10 (3d Cir. 1999) ("[W]hen such preliminary instructions are given, jurors must not be allowed to guess at which of two conflicting instructions control their deliberations. This can be avoided by simply informing jurors which instructions control in the event they perceive a conflict between something they are told during the course of the trial, and something contained in the formal instructions that will follow the close of the evidence."); *United States v. Hegwood*, 977 F.2d 492, 495 (9th Cir. 1992) ("The district court's error in its initial instruction was cured by its subsequent instruction."); *Guam v. Ignacio*, 852 F.2d 459, 461 (9th Cir. 1988) ("Because the trial judge used the correct instruction at the end of trial, and because the correct instruction was the only instruction given to the jury to take with them to the jury room, it is presumed that the jury followed the correct instruction."); *United States v. Norris*, 753 F. Supp. 2d 492, 521 (E.D. Pa. 2010) (holding that erroneous preliminary instruction was not prejudicial to defendant because the trial court informed the jury that the final instructions were controlling).

During the reading of the preliminary instructions, the district judge explained to the jury that "[d]epending on the evidence, I may in my final instructions define one or more of less serious crimes or give additional instructions. If this becomes necessary, I will give you those instructions at that time." The district judge subsequently told the jury that "[a]fter all of the evidence has been submitted, then I will read to you the full instructions and then we'll hear arguments of counsel and then there will be deliberations." Although the district court explained to the jury that a final

set of instructions would be submitted at the end of the trial, the court never expressly declared that the final instructions would control and take precedence over any conflicting preliminary instruction. Nevertheless, the district court's cautionary instruction about the final instructions appears sufficient to advise the jury that the final instructions, and not the preliminary instructions, were controlling in this case.

Finally, while reading the final instructions, the district court informed the jury that it was required to decide the case "by applying these instructions to the facts as you find them."

It is also significant that the only instruction delivered to the jury and taken into the jury room for the deliberations was the PIK involuntary manslaughter instruction. A jury is presumed to follow the instructions given to it. *State v. Mitchell*, 294 Kan. 469, 482, 275 P.3d 905 (2012). The jury was given the correct involuntary manslaughter instruction immediately before its deliberations and had a copy of that instruction to consult during those deliberations.

Accordingly, we find that a final jury instruction that correctly summarizes the law cures any prejudice caused by the giving of a legally inaccurate preliminary instruction so long as the trial judge explains to the jury at the time preliminary instructions are issued that the court will give the jury final jury instructions at the conclusion of the trial and that those instructions are controlling. The district court cured the preliminary instruction misstatement when it gave the final jury instructions.

## JURY INSTRUCTION ON PROXIMATE CAUSE

When a defendant fails to request a particular jury instruction, an appellate court reviews the claimed error under a clearly erroneous standard of review. Under this standard, the failure to give a particular jury instruction is clearly erroneous if there is a real possibility the jury would have rendered a different verdict had the instruction error not occurred. *State v. Holman*, 295 Kan. 116, Syl. ¶ 3, 284 P.3d 251 (2012).

At trial, Rivera did not request that the district court give a jury instruction on proximate cause; she now asserts that the district court should have given such an instruction. Rivera maintains that

the jury could have found that Rivera should have reasonably foreseen that G.R. could be injured when she left him in Jones' care; however, she argues that her involuntary manslaughter conviction should be reversed because the jury was never directed to find that Rivera's actions were the proximate cause of G.R.'s death.

At the conclusion of the trial, the district court instructed the jury that in order to find Rivera guilty of involuntary manslaughter, the jury had to find that Rivera "unintentionally killed [G.R.]" Elaborating on the concept of proximate causation as it relates to the crime of involuntary manslaughter, our Supreme Court stated:

"The legislature chose to use the word 'killing' to describe the death of the victim for each of the potential means of involuntary manslaughter it defined. 'Killing' connotes specific, proximate causation—not merely a peaceful, natural death. We note that Black's Law Dictionary recognizes the word's necessary implication; 'kill' means 'to end life, to *cause* physical death.'[Citation omitted.]" *State v. Scott*, 285 Kan. 366, 371, 171 P.3d 639 (2007).

The lack of a separate instruction on proximate cause was not clearly erroneous. Because the phrase "unintentional killing" in the involuntary manslaughter instruction required the jury to find that Rivera's actions caused the death of G.R., no separate instruction on proximate cause was necessary. There is no real possibility that the jury would have rendered a different verdict had the district court submitted a separate instruction on proximate cause.

### INVOLUNTARY MANSLAUGHTER INSTRUCTION

The State charged Rivera with involuntary manslaughter under K.S.A. 21-3404(b), which proscribes the unintentional killing of a human being committed during the commission of a misdemeanor that was enacted to protect human life or safety. The State alleged that the qualifying misdemeanor was the crime of endangering a child. However, at the conclusion of the trial, the district court instructed the jury that in order to convict Rivera of involuntary manslaughter, the State had to prove the following elements:

"1. That the defendant unintentionally killed [G.R.];

"2. That it was done while in the commission of endangering a child, and

"3. That this act occurred on or about the 4th day of October, 2009, in Leavenworth County, Kansas."

Rivera contends that this instruction was defective because it did not advise the jury of the elements of endangering a child, which was the underlying misdemeanor necessary to support the involuntary manslaughter charge. Rivera did not object to the instruction, nor did she request that the instruction include the elements of endangering a child.

Rivera failed to request the instruction, and so we review the issue under a clearly erroneous standard. Under this standard, the failure to give a particular jury instruction is clearly erroneous if there is a real possibility the jury would have rendered a different verdict had the instruction error not occurred. *Holman*, 295 Kan. 116, Syl. ¶ 3.

Rivera argues that the involuntary manslaughter charge is similar to felony murder and if the instruction "had been consistent with the rules for instruction on felony murder, the jury would have been instructed on the elements of the underlying misdemeanor offense (endangering a child) as part of the elements instruction for involuntary manslaughter."

The Notes on Use to PIK Crim. 3d 56.02—the instruction for felony murder—state that in addition to the felony-murder instruction, the elements of the underlying inherently dangerous felony should also be set out either by reference to another instruction that lists those elements, or the elements should be set forth in the concluding portion of the felony-murder instruction. The Notes on Use to PIK Crim. 3d 56.06—the instruction for involuntary manslaughter—do not contain a similar recommendation for the variant of involuntary manslaughter involved in this case. However, our Supreme Court has held that an aggravated burglary instruction was defective when the district court failed to instruct the jury on the elements of the underlying offense that the State was required to prove in order to prove the aggravated burglary charge. *State v. Linn*, 251 Kan. 797, 802, 840 P.2d 1133 (1992), *superseded on other grounds as noted in State v. Hedges*, 269 Kan. 895, 8 P.3d 1259 (2000).

In this case, in order to prove the charge of involuntary manslaughter, the State was required to prove that Rivera also committed the underlying misdemeanor of endangering a child. In the

same way that a felony-murder instruction must include the elements of the underlying felony by either including the additional elements in the instruction or by referring to a separate instruction that lists the elements, any instruction that pertains to the crime of involuntary manslaughter charged under K.S.A. 21-3404(b) must include the elements of the underlying offense in the concluding portion of the instruction or by reference to a separate instruction that is included with the entire set of instructions. Thus, the district court erred by not including the elements of endangering a child in the involuntary manslaughter instruction given to the jury.

At the conclusion of the trial, the district court gave the jury a separate instruction that set out the elements of endangering a child. The endangering a child instruction pertained to a separate crime charged, and no reference was made to this instruction in the involuntary manslaughter instruction. But the district court was required to include in its instruction to the jury on involuntary manslaughter the elements of the underlying crime. Accordingly, we find that the district court erred in failing to include the elements of endangering a child in the involuntary manslaughter instruction. Thus, the jury was not properly instructed on the elements of the underlying offense that the State was required to prove in order to convict Rivera of involuntary manslaughter.

## UNANIMITY INSTRUCTION

Rivera argues that the district court erred by failing to give a unanimity instruction because this was a multiple acts case and the State never elected which act it was relying upon to support each charge. Specifically, Rivera contends that this is a multiple acts case because the State charged her with involuntary manslaughter, with endangering a child as the underlying misdemeanor, as well as charging her with endangering a child. She argues that the jury heard evidence of a number of acts that could have satisfied the elements of endangering a child for either offense.

When a defendant fails to request a particular jury instruction, an appellate court reviews under a clearly erroneous standard of review a defendant's claim that a district court erred by failing to

give a particular instruction. Under this standard, the failure to give a particular jury instruction is clearly erroneous if there is a real possibility the jury would have rendered a different verdict had the instruction error not occurred. *Holman*, 295 Kan. at 116, Syl. ¶ 3. Because Rivera did not request a unanimity instruction, the claim is reviewed under the clearly erroneous standard.

A multiple acts issue exists when the State presents evidence of several acts and any one of those acts could constitute the crime charged. In a multiple acts case, a jury must be unanimous as to which act or incident constitutes the crime charged. In order to ensure jury unanimity, the State must elect the specific act or incident it is relying upon to support the crime charged or the court must instruct the jury that all of the jurors must agree that the same underlying criminal act or incident has been proven beyond a reasonable doubt. *State v. Bailey*, 292 Kan. 449, 458, 255 P.3d 19 (2011).

In Count 1 of the amended complaint, the State charged Rivera with involuntary manslaughter, alleging:

"That on or about the 4th day of October, 2009, in Leavenworth County, Kansas, Monica Felice Rivera, then and there being present did unlawfully, feloniously and unintentionally kill [G.R.], which was done in the commission of, or attempt to commit, or flight from the commission of Endangering a Child, a misdemeanor, as defined in K.S.A. 21-3608, that is enacted to protect human life or safety, in violation of K.S.A. 21-3404, Involuntary Manslaughter, a severity level 5 person felony."

Count 2 of the amended complaint alleged:

"That on or between the 1st day of October, 2009 and the 4th day of October, 2009, in Leavenworth County, Kansas, Monica Felice Rivera, then and there being present did unlawfully, intentionally and unreasonably cause or permit [G.R.], a child under 18 years of age, to be placed in a situation in which the child's life, body or health could be injured or endangered, in violation of K.S.A. 21-3608, Endangering a Child, a class A person misdemeanor."

On Count 2, the State presented evidence of two particular incidents that could have supplied the factual basis to support the endangering a child charge. First, the State presented evidence that Rivera left G.R. with Jones on October 1 while she was at work. Later that day, Rivera received a call from Jones informing

her that G.R. had fallen down the stairs. The State also presented evidence that Rivera left G.R. with Jones on October 4. On that day, while Rivera was at work, she received another phone call from Jones telling her that G.R. had fallen down the stairs again and that she needed to hurry home. When Rivera returned home, she discerned that G.R. was seriously injured and transported him to the hospital, where G.R. later died.

The State's theory of the case was that the reports of G.R. falling down the stairs were fabricated, that Jones physically abused G.R. and inflicted physical injuries on him, and that Rivera knew or reasonably should have known about this abuse. The jury convicted Rivera of endangering a child. However, the problem is that the jury could have convicted Rivera of endangering a child based upon the events that occurred on October 1 or the events that occurred on October 4. The issue is exacerbated by the fact that the State's involuntary manslaughter charge required the State to prove the endangering a child misdemeanor as a necessary element of that offense, and the amended complaint specified that the events in question related to the involuntary manslaughter charge occurred on October 4. The jury convicted Rivera of both involuntary manslaughter and endangering a child. Thus, there is a possibility that the jury could have convicted Rivera of both offenses based upon the same events from October 4.

In order to confirm that the jury did not do this, the State has to elect which act or incident it is relying upon to support each charge, or the district court has to give a unanimity instruction. Here, the district court did not give a unanimity instruction, and the State never elected which act it was relying upon to support each of the charges. A review of the trial transcript containing the State's closing argument reveals that the State argued to the jury that the events of October 1 through October 4 were a continuous and related set of events that led up to the killing of G.R. by Jones. Accordingly, there is no way of knowing whether the jury convicted Rivera based solely on the events of October 4, or whether it convicted her of endangering a child based upon the events of October 1 and involuntary manslaughter based upon the events of October

4. Thus, Rivera's convictions must be reversed and the case remanded for a new trial.

## IS ENDANGERING A CHILD A LESSER INCLUDED OFFENSE OF INVOLUNTARY MANSLAUGHTER?

The question of whether one crime is a lesser included offense of another crime is a question of law over which an appellate court exercises unlimited review. *State v. Parks*, 294 Kan. 785, 802, 280 P.3d 766 (2012).

Rivera argues that she could not properly be convicted of both involuntary manslaughter and endangering a child because the involuntary manslaughter offense with which she was charged required the State to prove that she committed the crime of endangering a child. Therefore, Rivera contends that all of the elements of the lesser crime—endangering a child—are identical to some of the elements of the greater crime—involuntary manslaughter. Rivera did not raise this argument before the district court but asserts that the issue may be raised for the first time on appeal to serve the ends of justice and prevent a denial of fundamental rights. See *State v. Nguyen*, 285 Kan. 418, 433-34, 172 P.3d 1165 (2007).

K.S.A. 21-3107(2) provides that "[u]pon prosecution for a crime, the defendant may be convicted of either the crime charged or a lesser included crime, but not both." K.S.A. 21-3107(2)(b) goes on to specify that a lesser included crime includes "a crime where all elements of the lesser crime are identical to some of the elements of the crime charged."

Our Supreme Court recently addressed a similar issue in *Parks*. In that case, the court held that a defendant may be convicted and sentenced for both felony murder and aggravated robbery, even when the aggravated robbery is the underlying felony for the felony-murder charge. *Parks*, 294 Kan. at 801-04. That analysis is equally applicable in this case. Rivera could be convicted of both involuntary manslaughter and endangering a child, even when the endangering a child charge supplied the underlying misdemeanor for the involuntary manslaughter charge. Additionally, Rivera's argument is also problematic because she fails to acknowledge that she could have been convicted of both charges based upon events

that transpired on separate dates. Therefore, Rivera's claim that endangering a child is a lesser included offense of involuntary manslaughter is without merit.

## JURISDICTION

The question of whether a complaint is sufficient to confer subject matter jurisdiction on the district court is a question of law over which an appellate court has unlimited review. *State v. Scott*, 286 Kan. 54, 62, 183 P.3d 801 (2008).

Prior to trial, Rivera filed a motion to dismiss the amended complaint because the endangering a child charge was defective. Specifically, Rivera contended that this charge was defective because the amended complaint omitted the reasonable probability element. The district court denied Rivera's motion because it stated that it would inform the jury of all the necessary elements of the offense, including the reasonable probability element, when the court issued the final instructions to the jury.

Count 2 of the amended complaint alleged:

"That on or between the 1st day of October, 2009 and the 4th day of October, 2009, in Leavenworth County, Kansas, Monica Felice Rivera, then and there being present did unlawfully, intentionally and unreasonably cause or permit [G.R.], a child under 18 years of age, to be placed in a situation in which the child's life, body or health could be injured or endangered, in violation of K.S.A. 21-3608, Endangering a Child, a class A person misdemeanor."

Because Rivera challenged the sufficiency of the amended complaint prior to trial, we review the document to determine whether it omits one or more of the essential elements of the crime it attempts to charge. See *State v. Reyna*, 290 Kan. 666, 677, 234 P.3d 761, *cert. denied* 131 S. Ct. 532 (2010). Under this standard, a complaint is sufficient if it substantially follows the language of the statute or charges the offense in equivalent words or others of the same import so long as the defendant is fully informed of the particular offense charged and the court is able to determine under what statute the charge is founded. *Reyna*, 290 Kan. at 677.

In this case, the amended complaint was sufficient because it substantially followed the language of K.S.A. 21-3608(a).

## Request for a Continuance

An appellate court reviews a district court's decision to grant or deny a continuance for an abuse of discretion. *State v. Cook*, 281 Kan. 961, 986, 135 P.3d 1147 (2006). An abuse of discretion occurs when the action is arbitrary, fanciful, or unreasonable. This means no reasonable person would have taken the action of the trial court. *State v. Sellers*, 292 Kan. 117, 124, 253 P.3d 20 (2011).

Rivera argues that the district court abused its discretion by denying her request for a continuance because this case moved rapidly from preliminary hearing to trial and her counsel did not have adequate time to review documents, interview witnesses, and prepare for trial. The preliminary hearing in this case was held on July 8, 2010. Three pretrial hearings were held on July 19, July 23, and July 30. The case was tried to a jury from August 2 to August 5. Thus, there was less than a month between the preliminary hearing and the trial date.

At the July 23 hearing, Rivera's counsel orally requested a continuance. Rivera's counsel asserted that the defense required additional time to prepare for trial, review recently received discovery materials, prepare the testimony of new witnesses, send out subpoenas for witnesses from SRS, file new motions, and interview witnesses involved in G.R.'s CINC case. The district court denied Rivera's request for a continuance because the court concluded that the nature of the case had not changed significantly since the case was initially filed in October 2009.

Although there was a quick turnaround from the preliminary hearing to the pretrial hearings and to the jury trial, the case itself was nearly a year old when the trial occurred. The district court's rationale for denying Rivera's request for a continuance was not unreasonable.

Even more damaging to Rivera's argument are the events that transpired at the July 30 pretrial hearing. At that hearing, the district court asked Rivera's counsel several times whether the defense was renewing its request for a continuance. Rivera's counsel never specifically renewed the request for a continuance but declared that the defense was as prepared as it could be under the circum-

stances to proceed to trial the following week. Taking into consideration the events of the July 30 hearing, it is difficult to conclude that the district court's previous denial of Rivera's motion for a continuance was unreasonable because the court gave Rivera additional opportunities to pursue a continuance and Rivera did not take advantage of that opportunity. Therefore, the district court did not abuse its discretion in denying Rivera's request for a continuance.

## CUMULATIVE ERROR

An appellate court evaluates a cumulative error claim to determine whether the totality of the circumstances substantially prejudiced the defendant and denied him or her a fair trial. *State v. Edwards*, 291 Kan. 532, 553, 243 P.3d 683 (2010). Cumulative error will not be found when the record fails to support the errors raised on appeal by the defendant, and a single error is insufficient to support reversal under the cumulative error rule. *State v. Cofield*, 288 Kan. 367, 378, 203 P.3d 1261 (2009).

Because we found that the district court erred in failing to give the unanimity instruction and in failing to list the elements of the misdemeanor underlying the involuntary manslaughter charge, we find that Rivera was denied a fair trial.

We affirm in part, reverse in part, and remand the case for a new trial.