NOT DESIGNATED FOR PUBLICATION

No. 116,049

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

EDWARD M. LADISH,
*Appellant*.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; JEFFREY E. GOERING, judge. Opinion filed October 6, 2017. Affirmed.

*Ryan J. Eddinger* and *Sam Schirer*, of Kansas Appellate Defender Office, for appellant.

*Lance J. Gillett*, assistant district attorney, *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before MALONE, P.J., PIERRON and BRUNS, JJ.

PER CURIAM: A jury convicted Edward M. Ladish of second-degree murder, aggravated battery with bodily harm, and theft. Ladish filed a pro se motion for new trial alleging ineffective assistance of counsel. The district court held a hearing on the motion but ultimately denied it. Ladish appeals arguing the district court erred in finding his trial counsel effective, and it erred in failing to give a proximate cause instruction at trial. We affirm.

On the morning of July 5, 2014, Jeremiah Palmer woke up and noticed his brother's pickup truck was no longer parked in the driveway of their home. Jeremiah's brother, Shawn Palmer, drove a burgundy 1993 extended cab Ford F-150 with Oklahoma tags, a tunnel cover, and a black grill. Jeremiah sent Shawn a text message at 7:18 a.m. to see if Shawn was awake. When Jeremiah did not get a response, he went to Shawn's bedroom and saw that Shawn was still there. Jeremiah told Shawn the truck was gone, and Shawn became upset. Since their father was still the registered owner of the truck, the brothers called him to get the tag information to file a police report.

The brothers spoke with a neighbor who had been up until at least 2 a.m. shooting fireworks the night before. The neighbor said he had not seen anything unusual. Jeremiah and Shawn began looking around the neighborhood thinking maybe someone had simply moved the truck. While walking around, they noticed a white van parked at the end of their dead-end street. Jeremiah did not recall ever having seen the van before.

The brothers decided to go to the Quik Trip about a half block from their home to get some food and coffee. Shortly after arriving, Jeremiah saw Shawn's truck drive into the parking lot. He knew it was Shawn's truck because it had a black spray-painted front grill. Shawn had recently spray-painted the grill of his truck black. However, the truck was pulling a trailer that did not belong to Shawn.

Shawn approached the driver's side of the truck demanding that the driver get out. Jeremiah went to the passenger side of the truck and heard the driver say something in what he assumed was Spanish. Jeremiah saw only one person in the car—a Hispanic male wearing a white tank top. Jeremiah placed one hand on the passenger side door handle and one hand on the truck bed. He started to tell the driver to get out of the truck when the driver began driving out of the parking lot. Jeremiah was still holding on to the truck. He could not see Shawn, but he could hear Shawn yelling from the other side of

the truck. Jeremiah and Shawn repeatedly told the driver to stop the truck, but the driver continued to accelerate in a jerking manner.

The driver made an erratic right turn and continued to accelerate. Jeremiah realized the driver was not going to slow down, so he let go of the truck. He fell to the ground and was hit by both the truck and the trailer. Jeremiah saw Shawn being thrown from the truck like a projectile.

Jeremiah suffered lacerations, road rash, a burn mark on his back from a tire, a rotator cuff injury, and a cracked rib. Shawn suffered multiple abrasions and bruises, a fracture to the base of his skull, and brain hemorrhaging. Shawn died as a result of his injuries.

John Carr, Shawn and Jeremiah's neighbor, was also at the Quik Trip and saw Shawn and Jeremiah confront the driver of the truck. It appeared to Carr that the brothers were trying to get into the truck or to get the driver out of the truck. The truck then drove off aggressively while Shawn and Jeremiah were hanging on through the windows. Carr saw both brothers fall and be hit by the truck.

While Carr was giving a statement to the responding officers on the scene, his roommate, Mason Pierce, called and told Carr he had seen Shawn's truck drive by their home. Mason described the driver as a man with "tanner skin, little to no hair . . . [a]nd what looked like a dark blue sleeveless shirt." The truck, still pulling the trailer, had been going faster than the usual traffic for that neighborhood and was heading towards a dead-end. The truck drove past the dead-end sign and into a field, only stopping once it was about halfway through the field. The driver stopped in an area of 4 to 5 foot tall grass, and Mason could not see if anyone got out of the truck.

Travis Fowler, who was on his way to the Quik Trip at the time of the incident, heard squealing tires and saw a red pickup truck drive out of the parking lot. Fowler saw someone fall off the truck. He saw someone else hanging on to the driver's side of the truck. The truck drove erratically down the street, and eventually the second person was thrown from the truck. Fowler did not see the driver of the truck.

Officer Chris Welsh was in the area of the Quik Trip and arrived soon after. He saw Shawn lying in the southbound lane of the street. He tried to speak with Shawn, but Shawn was unresponsive. Shawn had a lot of road rash and blood on his body. He was also "posturing." He stiffened and relaxed repeatedly. Welsh left Shawn to the care of the emergency medical personnel on the scene.

Officer Welsh took a brief statement from Jeremiah regarding the incident. Jeremiah described the driver of the truck as a dark-skinned or Hispanic male. Jeremiah was unable to identify Ladish in a line-up or at trial.

Sometime between 7:45 and 8 a.m., Theron Snyder, who lived within walking distance of Jeremiah's and Shawn's home, was outside. A Hispanic or light-skinned African-American man approached Snyder. The man had no hair and was wearing a white tank top and blue shirt. The man asked for a ride, saying two people were chasing him. Snyder agreed to give the man a ride. The man directed Snyder to a trailer park. On the way, Snyder noticed an increased police presence in the area. At one point, an officer passed them heading in the opposite direction, and the man asked if the officer had turned around. At trial, Snyder identified Ladish as the man he had driven to the trailer park.

A witness told Officer Aaron Gillispie that the suspect might be at a trailer park. Gillispie went to the trailer park around 9 a.m. and saw two men in a truck on their way to the mailbox. He believed one of the men matched the description of the suspect—Hispanic, bald, and wearing a white tank top under a blue short-sleeved shirt. Gillispie

4

spoke with the man, who identified himself as Ladish. Ladish was calm and talkative at first, but as more officers arrived he became nervous. Gillispie eventually took Ladish into custody. He also took possession of some keys Ladish had hanging from a lanyard around his neck.

Chelsea Frazier lived in the trailer park. She is the mother of Ladish's five children. She and Ladish were still in a relationship at the time of the incident. Ladish often stayed over at her home. Frazier had gone to bed around 11:30 p.m. on July 4, 2014. When she woke up the next morning, her white minivan was missing. She only had one set of keys for the van, which were on a lanyard.

Frazier identified the keys on the lanyard as the keys to her van. Frazier gave police consent to search her home. Police found a pair of wet, grey Nike tennis shoes with weeds or grass stuck to the soles in the bathtub. According to Frazier, Ladish owned a pair of grey Nike tennis shoes.

Frazier had known Ladish for almost 15 years. She also knew Ladish's family. Ladish's mother was Mexican, but to Frazier's knowledge his mother had never taught him Spanish. Ladish sometimes used the Spanish words for son and daughter to refer to his children, but Frazier had never heard him use any other Spanish on a regular basis.

Officer James Bray responded to the scene of the accident, took photographs and measurements and made observations of tire marks, scuff marks, and other physical evidence. Based on these measurements, he was able to estimate that the truck was going approximately 31 miles per hour at the time Shawn fell off the truck and hit the pavement.

Officer Christopher Engle-Tjaden was dispatched to the field where Shawn's truck had been abandoned. He photographed the truck, dusted for fingerprints, and swabbed for

5

DNA. None of the fingerprints matched Ladish. A DNA profile obtained from the steering wheel was consistent with Ladish's DNA profile. A partial profile taken from the gear shift was also consistent with Ladish's profile.

The State initially charged Ladish with one count of first-degree felony murder or in the alternative one count of second degree murder; one count of aggravated robbery; one count of aggravated battery with great bodily harm; and one count of theft. Ladish's appointed counsel, Gary Owens, filed a motion to dismiss the charges of first-degree murder and aggravated robbery. He argued the facts could not support a charge of robbery, and without an inherently violent felony, the State could not charge Ladish with felony murder. The State voluntarily dismissed both charges before the district court ruled on the motion.

On May 27, 2015, a jury found Ladish guilty of one count of second-degree murder, one count of the lesser included offense of aggravated battery with bodily harm, and one count of theft. On July 28, 2015, Ladish filed a pro se motion alleging ineffective assistance of counsel. As part of the motion, Ladish included a complaint he had filed with the disciplinary administrative review board, which he incorporated into his motion by reference. Ladish alleged Owens had (1) failed to acquire school transcripts to demonstrate he could not speak Spanish; (2) failed to acquire phone records from the night before the incident to help build a timeline of his whereabouts; and (3) failed to investigate a proposed witness.

The district court construed Ladish's pro se motion as a motion for new trial based on ineffective assistance of counsel. The court appointed Casey Cotton to represent Ladish on the motion. After several continuances, the court held a hearing on January 22, 2016.

Ladish testified he had told Owens he was intoxicated the night before the incident. According to Ladish, "at a certain point once I got high the evening got real shady on me and I don't remember a lot, but I know where I was at certain points." He testified he had told Owens that at the time the crime occurred, he was "pilfering" the neighborhoods near Jeremiah's and Shawn's home.

Ladish told the court he had received a letter from a Jillian Bortz in March 2015 suggesting that Bortz had been with him at the time of the crime and would be able to provide him with an alibi. According to Ladish, Bortz said Ladish had been at Douglas Bett's house with her and Jessica Fanning. Ladish did not remember being there. Ladish stated he had shown the letter to Owens and asked him to consider her as a possible witness. He admitted, however, that he did not know what Bortz' testimony would be.

Ladish said he also gave Owens the name of Shandee Prodvence. He testified he had been at Prodvence's home until 3 or 3:30 a.m. on July 5. He thought Prodvence's testimony could help establish his whereabouts prior to the crime. He acknowledged, however, that Prodvence had told police Ladish had been at her home until 8:30 a.m., contrary to his recollection of the night.

Ladish testified he had wanted Owens to do more to establish that he did not speak Spanish. Jeremiah had testified the driver spoke Spanish, but Ladish contended he did not know any Spanish other than a few basic words. According to Ladish, he failed Spanish in high school, and he wanted Owens to introduce his school transcripts. He knew Owens had taken some steps to secure the transcripts, but he was not sure that Owens had ever gotten them.

Ladish also testified he believed Owens should have objected to the admission of the State's DNA evidence at trial. Ladish had learned of a drug case where the district court had suppressed evidence regarding the narcotics because of the consumption of the

7

evidence. His understanding was the narcotics had been consumed during the State's testing, and because the defendant in that case could not conduct independent testing of the narcotics, the case had been thrown out. He believed the same rationale should apply in his case. Ladish said he told Owens that he wanted Owens to object to the DNA evidence. He explained to Owens that as far as he understood, if the defense was not allowed to do an independent DNA test, then the State's DNA evidence was inadmissible. According to Ladish, Owens told him he was not going to object because it would not help his defense in any way.

Owens testified that Ladish had told him that the night before the incident he had been at Frazier's house until about 1 a.m. He then went to Quik Trip, talked to a black female, dropped a female off at her apartment, and went to Prodvence's house, where he stayed until 3 a.m. After that, he could not remember anything until he got home around 7:30 or 8 a.m. Owens' investigator had interviewed Shandee, but her story was not consistent with Ladish's. Owens made a strategic decision not to call Shandee as a witness.

Owens testified Ladish had told him about a possible alibi witness. Ladish did not give him the name of the witness, saying only that she was in custody in another city and someone would be in touch once she was released. Owens was worried that any testimony this unnamed witness might offer would be perjured, because Ladish did not mention her until shortly before the beginning of the trial. Owens did not recall Ladish ever showing him a letter from a possible alibi witness or telling him Bortz' name. He also did not remember Ladish ever mentioning Fanning or Betts.

Owens testified he obtained Ladish's school transcripts before the trial. According to Owens, the transcripts showed that Ladish got an A in Spanish in seventh grade and a D in Spanish in tenth grade. Ladish did not take Spanish in eighth or ninth grade. Owens did not believe the transcripts demonstrated that Ladish did not speak Spanish, so he did

not offer them into evidence. The State introduced evidence that Ladish had exposure to Spanish and knew some basic Spanish words, but Owens did not think the transcripts would counter that. Instead, he asked Frazier on cross-examination about Ladish's lack of Spanish language skills.

As for the DNA evidence, Owens explained that typically the State provides notice if it is going to consume DNA evidence in testing, and the defendant has an opportunity to object. If the defendant does object, the district court holds a hearing to determine if it will allow the State to consume the DNA. Owens stated that when the State notified him that it would consume all the DNA evidence, he did not object. He remembered Ladish asking him to independently review the DNA evidence, but he did not remember Ladish asking him to object to the admission of the evidence.

Owens explained that in his experience, the only reason to go through the effort and expense of retesting DNA is if an independent examination revealed a flaw in the State's testing. Owens had the State's results independently evaluated, and there was no flaw. The independent evaluator did, however, assist Owens in building a defense based on transfer DNA.

Cotton also had Mark Rudy, the Chief Public Defender for Sedgwick County, proffer testimony from Bortz. Rudy testified he had spoken with Bortz, and she had told him she did not want to testify at the hearing on Ladish's motion for a new trial. They discussed her potential for being a witness, but she said her testimony would not be beneficial to Ladish. She told Cotton that neither Owens nor any investigator had ever interviewed her, but she did not know if Owens even knew who she was or would have any reason to interview her.

Cotton also proffered testimony from Fanning. Fanning had told him she had hung out with Ladish before but never at Bett's home. She had no recollection of being with Ladish in the late hours of July 4th or the early morning hours of July 5th.

The district court ultimately denied Ladish's motion for new trial based on ineffective assistance of counsel. The court found it was uncontroverted that neither Bortz nor Fanning had testimony that would have been beneficial to Ladish, therefore Ladish had failed to establish any prejudice due to Owens failure to investigate or call these witnesses. The court found Owens had made a strategic decision not to use Ladish's school transcripts after obtaining them, and this decision was virtually unchallengeable. As for the DNA evidence, the court found any objection would have been futile because Owens' independent investigation revealed there were no flaws in the State's testing process. The court addressed several other allegations which Ladish does not raise on appeal and found that Ladish had not carried his burden to demonstrate that Owens had been ineffective on any of them.

On February 5, 2016, the district court denied Ladish's departure motion and sentenced him to 476 months in prison. Ladish appeals his convictions and the district court's denial of his motion for a new trial.

Ladish's motion for new trial was filed more than 14 days after his conviction, so it was untimely. K.S.A. 2016 Supp. 22-3501. Neither party addresses jurisdiction, but our Supreme Court has held that when a district court rules on an untimely motion for new trial based on ineffective assistance of counsel, we have jurisdiction to hear the appeal. *State v. Reed*, 302 Kan. 227, Syl. ¶ 1, 352 P.3d 350 (2015).

On appeal, Ladish focuses on three reasons Owens was ineffective: (1) He failed to investigate Bortz and Fanning as possible alibi witnesses; (2) he failed to introduce

Ladish's school transcripts to demonstrate his lack of Spanish language skills; and (3) he failed to object to the State's DNA evidence.

A claim alleging ineffective assistance of counsel presents mixed questions of fact and law. When the district court conducts a full evidentiary hearing on such claims, the appellate court first determines whether substantial competent evidence supports the district court's factual findings and whether the factual findings supported the court's legal conclusions. Then, the appellate court reviews the district court's legal conclusions using a de novo standard. *Fuller v. State*, 303 Kan. 478, 485, 363 P.3d 373 (2015). To prevail on a claim of ineffective assistance of counsel, a criminal defendant must establish (1) the performance of defense counsel was deficient under the totality of the circumstances, and (2) prejudice, i.e., there is a reasonable probability the jury would have reached a different result absent the deficient performance. *Sola-Morales v. State*, 300 Kan. 875, 882, 335 P.3d 1162 (2014) (relying on *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 [1984]).

*Failure to Call Alibi Witnesses*

Ladish argues Owens was ineffective because he did not interview Bortz or Fanning before trial. He claims the district court erred in focusing on whether Bortz and Fanning had any beneficial testimony at the time of the motion for a new trial rather than whether Owens' failure to investigate them as possible alibi witnesses was reasonable. The State contends the court did not err because Ladish failed to show that Owens' actions prejudiced him at trial.

The decision on what witnesses to call is a strategic decision within the exclusive purview of counsel. *Bledsoe v. State*, 283 Kan. 81, 92, 150 P.3d 868 (2007). If counsel has made a strategic decision after making a thorough investigation of the law and the facts relevant to the realistically available options, then counsel's decision is virtually

11

unchallengeable. Strategic decisions made after a less than comprehensive investigation are reasonable exactly to the extent a reasonable professional judgment supports the limitations on the investigation. *State v. Cheatham*, 296 Kan. 417, 437, 292 P.3d 318 (2013) (citing *Strickland*, 466 U.S. at 690-91).

Ladish and Owens presented conflicting testimony on Owens' attempts to investigate proposed alibi witnesses. The district court declined to resolve the conflict in testimony, relying instead on Ladish's inability to demonstrate prejudice. The court did not err in doing so. The failure of counsel to investigate and subpoena his or her client's alibi witness can be ineffective assistance if the client is prejudiced by such failure. *State v. James*, 31 Kan. App. 2d 548, Syl. ¶ 7, 97 P.3d 857 (2003). If a defendant fails to establish prejudice, this court may deny relief without addressing the adequacy of counsel's representation. See *Strickland*, 466 U.S. at 697 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed."); *Sola-Morales*, 300 Kan. at 886.

As the district court pointed out, both Fanning and Bortz stated they did not have any testimony that would benefit Ladish. The only rebuttal Ladish presented at the hearing was his claim that he had received a letter from Bortz alleging a possible alibi for him. He did not present the letter at the hearing nor is it in the record. Nevertheless, Ladish admitted he did not know what Bortz' testimony would be at the time he received the letter, and it had "panned out to be nothing." Thus, the court was correct to find Fanning and Bortz' testimony was not beneficial and there was no prejudice to Ladish.

In his appellate brief, Ladish fails to establish how Owens' performance prejudiced him. He does not explain how the jury's verdict would have been different if Owens had interviewed Bortz or Fanning prior to trial. He only claims that Owens' failure to investigate possible alibi witnesses meant the jury did not have an explanation for Ladish's whereabouts in the hours before the accident, and such information would have

been helpful in a case built on circumstantial evidence. While an alibi witness certainly would have been helpful to Ladish's defense, he has not identified any witness who could have provided him with an alibi or any other similarly beneficial testimony.

Ladish claims it was error for the district court to focus on Bortz' and Fanning's proffered testimony at the time of the hearing on the motion for a new trial. Presumably, he is implying Bortz and Fanning may have provided different information if Owens had interviewed them prior to trial. This relates to Owens' fear that Ladish's proposed alibi witness might provide perjured testimony. More importantly, even if there is a possibility Bortz and Fanning might have provided different testimony, this does not meet the standard of prejudice. Ladish must show there is a reasonable possibility the outcome of the trial would have been different if Owens had interviewed Bortz and Fanning. Ladish, however, has offered nothing more than speculation.

Ladish urges us to focus on the first prong of the *Strickland* standard. In order for Owens to be considered ineffective, however, Ladish must satisfy both prongs of the test. Because he cannot demonstrate any prejudice due to Owens' failure to investigate Bortz or Fanning, his claim fails.

*Failure to Introduce Transcripts into Evidence*

Ladish argues Owens was ineffective for failing to introduce school transcripts to establish his lack of Spanish language skills. Specifically, he contends the introduction of the records was necessary to corroborate Frazier's testimony that Ladish did not speak Spanish, particularly because the jury would recognize Frazier's potential for bias. The State counters that Owens made a strategic decision not to use the transcripts after a reasonable investigation, thus, his actions are unchallengeable. The State adds, however, the transcript likely would have done more harm than good.

13

Owens obtained Ladish's school transcripts reflecting his grades in Spanish, but he made a strategic decision not to introduce them. He felt they did not prove anything either way. Instead, he used Frazier's testimony that Ladish did not speak any Spanish. Because Owens investigated the transcripts and considered them within the context of the other evidence available to him, his strategic decision not to use them is essentially unchallengeable.

Even if Owens' performance was deficient for failing to introduce the transcripts, Ladish has not demonstrated prejudice. Ladish's inability to speak Spanish was not critical to his defense. Jeremiah testified the driver had spoken what sounded like Spanish. Since Jeremiah did not speak Spanish, however, he could not definitively say it was Spanish. No one testified that the driver had said anything more than basic Spanish words or phrases. Ladish's school transcripts would do little to establish he did not speak Spanish. In fact, they would establish Ladish received Spanish language education in school and at one point had done well in the subject. And, as Owens noted, Ladish may have received a D in Spanish for reasons other than Spanish language ability, such as failure to attend class or turn in homework. The evidence would have done little to counter the State's evidence that Ladish had exposure to Spanish and knew some basic Spanish words. In fact, the transcripts would have corroborated the State's evidence. Because Ladish has failed to establish prejudice, his claim of ineffective assistance on this point necessarily fails.

*Failure to Object to Consumption of DNA*

Ladish argues Owens should have objected to the State's consumption of the DNA evidence. He did not specifically raise any claim regarding DNA evidence in his written motion. At the hearing, Ladish testified he wanted Owens to object to the introduction of DNA evidence because the State had consumed the DNA evidence in its testing and the defense was unable to do independent testing. In closing, Cotton stated, "Mr. Owens did

14

not object to the consumption of the DNA evidence. And while that may be what routinely happens and those motions may be routinely denied, he, nevertheless, didn't object to it." Later, the district court gave Ladish a chance to address the court, and Ladish argued that Owens testified his standard practice is to object to the State's consumption of evidence but Owens did not do so in this case.

In its ruling, the district court focused on Ladish's argument that Owens should have objected to the admission of the DNA evidence. The court found Owens did not err in failing to object, because any such objection would have been futile. According to the court, the record demonstrated that Owens had his own expert evaluate the State's testing procedures and results, and the expert found nothing improper. The court reasoned that Owens would not have had grounds for an objection based on this evaluation.

On appeal, Ladish focuses on the claim that Owens should have objected to the State's notification that it would consume all the DNA evidence in its testing. The State responds Ladish is raising this argument for the first time on appeal, and we should decline to consider it. From the record, however, it appears that Ladish did raise this argument before the district court, if only briefly. Nevertheless, an objection based on the consumption of evidence, whether to the State's notification or during trial, is evaluated under the same legal standard, and Ladish failed to sufficiently argue this standard.

In order to succeed on this claim, Ladish must demonstrate there is some chance an objection would have been successful. DNA test results are generally admissible in Kansas courts, though "such test results may be inadmissible on grounds of relevancy or prejudice as well as under traditional challenges to admissibility of evidence such as contamination of the sample or chain of custody questions." *State v. Colbert*, 257 Kan. 896, 910, 896 P.2d 1089 (1995). When the State consumes an entire DNA sample in its testing, however, a defendant may challenge the State's consumption of the sample as a violation of due process based on the State's failure to preserve potentially exculpatory

15

evidence. To succeed on such a challenge, the defendant must show bad faith on the part of the State. Whether the State acted in bad faith is a question of fact. *Arizona v. Youngblood*, 488 U.S. 51, 57-58, 109 S. Ct. 333, 102 L. Ed. 2d 281 (1988); *State v. Kleypas*, 272 Kan. 894, 936-37, 40 P.3d 139 (2001), *overruled on other grounds by Kansas v. Marsh*, 548 U.S. 163, 126 S. Ct. 2516, 165 L. Ed. 2d 429 (2006); see also *United States v. Rogers*, No. 10-10140-01-JTM, 2010 WL 5015329, at *4 (D. Kan. 2010) (unpublished opinion) (analyzing objection to State's motion to consume DNA evidence using *Youngblood*).

In *Kleypas*, the Supreme Court found the district court did not err in refusing to suppress DNA evidence even though the State had failed to inform the FBI of a court order to use only the portion of any item necessary for testing. 272 Kan. at 936-37. In that case, the State sent several items to an FBI laboratory for testing. The defendant requested that the district court allow him to also examine the evidence, and the court ordered the State to use good faith in testing items and to only use any portion of an item necessary for testing. During the testing, the FBI totally consumed two samples.

Before trial, the defendant filed a motion to suppress the DNA evidence because the FBI had consumed the samples in violation of the district court's order. At a hearing on the motion, experts testified the two samples provided 200 and 400 nanograms of material for testing respectively. One expert testified that 50 nanograms is the minimum necessary for one of the tests performed by the FBI, but 200 nanograms was an ideal amount for more reliable results. Another expert testified that as a matter of protocol the FBI uses between 200 and 400 nanograms in testing.

In its ruling, the district court focused on the FBI's good faith in consuming the two samples during testing. The court held that the experts agreed 50 nanograms was necessary for testing, but the accuracy of the tests increased with the use of greater quantities. The size of the samples consumed was also within the FBI's routine testing

16

procedure. Applying the standard in *Youngblood*, the district court denied the motion to suppress. Applying an abuse of discretion standard, the Kansas Supreme Court held that substantial competent evidence supported the trial court's holding that the FBI did not act in bad faith. *Kleypas*, 272 Kan. at 937.

Ladish does not take issue with the district court's decision that he did not have grounds to object to the DNA evidence based on the State's testing procedure. Rather, he complains the court erred by not considering his ability to object to the consumption of the DNA evidence based on the State's bad faith. What he does not mention is that he did not argue that the State acted in bad faith at the district court level nor did he present the kind of evidence necessary to make this determination, as in *Kleypas*. Rather, he argued Owens should have objected to the consumption of the DNA evidence because the consumption of the evidence prevented Ladish from conducting independent testing which would have allowed Ladish to challenge the State's results. However, inability to conduct independent testing alone is not grounds for a successful objection to the consumption of evidence. As the court pointed out, Ladish was able to reevaluate the State's results and there were no grounds for objecting to the admission of the evidence based on the testing procedure.

On appeal, Ladish is essentially asking us to find the district court erred in failing to make findings on an argument that was never presented. He argues the court erred in finding any motion challenging the State's DNA evidence would have been futile because the court had not heard the merits of a claim based on bad faith. But Ladish bore the burden of presenting the merits of his claim to the district court. By not arguing bad faith, he failed to carry that burden. Moreover, Ladish does not allege in his appellate brief that the State acted in bad faith, thus he has abandoned any argument regarding bad faith. *State v. Williams*, 303 Kan. 750, 758, 368 P.3d 1065 (2016). Absent any such argument, Ladish cannot demonstrate an objection based on the State's consumption of the DNA

17

sample could have been successful, so his claim fails the prejudice prong of the *Strickland* test.

*Conclusion*

The district court did not err in denying Ladish's motion for new trial based on ineffective assistance of counsel. Ladish has not demonstrated how Owens' failure to investigate his proposed witnesses prejudiced him at trial. Owens' decision not to use Ladish's school transcripts was a strategic decision, so it is essentially unchallengeable. Finally, Ladish has not argued or shown the State acted in bad faith in consuming DNA evidence, so he has not shown that any such objection could have been successful. Therefore, this court should affirm the district court's denial of his motion for new trial.

*Proximate Cause*

Next, Ladish argues the district court should have given the jury an instruction on proximate cause regarding Shawn's death and Jeremiah's injuries. The State charged Ladish with second-degree murder for Shawn's death and aggravated battery with great bodily harm for Jeremiah's injuries. The court instructed the jury that it must find that Ladish "killed Shawn Palmer unintentionally but recklessly under circumstances that show an extreme indifference to that value of human life." The court defined reckless as "when the defendant consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation." The court also instructed the jury on aggravated battery with bodily harm as a lesser included offense of aggravated battery with great bodily harm. The court told the jury that in order for Ladish to be found guilty of the offense, it must find "Ladish recklessly caused bodily harm to Jeremiah Palmer under circumstances whereby great

18

bodily harm or disfigurement or death can be inflicted." The court did not provide any separate instructions on causation.

On appeal, Ladish argues the district court should have instructed the jury that "[t]he fault or lack of fault of [Shawn Palmer and Jeremiah Palmer] is a circumstance to be considered along with all the other evidence to determine whether the defendant's conduct was or was not the direct cause of Shawn Palmer[']s death and/or Jeremiah Palmer's injuries." He alleges this instruction is appropriate because Shawn's death and Jeremiah's injuries would not have occurred if the brothers had not confronted the driver of the truck and held onto the vehicle as it drove away. Ladish did not request this instruction at trial.

When a defendant does not object to the failure to give a jury instruction, the issue is not preserved for appellate review unless the failure to give the instruction is clearly erroneous. K.S.A. 2016 Supp. 22-3414(3); *State v. Pfannenstiel*, 302 Kan. 747, 752, 357 P.3d 877 (2015). To establish clear error, "'the defendant must firmly convince the appellate court that the giving of the instruction would have made a difference in the verdict.' [Citation omitted.]" *State v. Cooper*, 303 Kan. 764, 771, 366 P.3d 232 (2016). Before reviewing for clear error, though, we must first "consider whether the instruction was legally and factually appropriate, employing an unlimited review of the entire record. [Citation omitted.]" *State v. Louis*, 305 Kan. 453, 457-58, 384 P.3d 1 (2016). Here, a proximate cause instruction was neither legally nor factually appropriate.

Ladish's argument that the district court should have instructed the jury on proximate cause fails for several reasons. Kansas courts have defined proximate cause as "cause which in natural and continuous sequence, unbroken by an efficient intervening cause, produces the injury, and without which the injury would not have occurred, the injury being the natural and probable consequences of the wrongful act." *State v. Rivera*,

48 Kan. App. 2d 417, 431, 291 P.3d 512 (2012) (citing *Kuxhausen v. Tillman Partners*, 291 Kan. 314, Syl. ¶ 6, 241 P.3d 75 [2010]). Thus, Shawn and Jeremiah needed to have committed a wrongful act in order to be the proximate cause of the accident. As explained in *State v. Romero*, No. 105,158, 2012 WL 2924537 at *9 (Kan. App. 2012) (unpublished opinion):

> "[L]egal fault as it bears on causation requires breach of a duty owed under the law. That is, a person may be negligent or at fault if he or she fails to act in a way the law requires or acts in a way the law prohibits with respect to the party claiming harm."

Ladish has not identified any duty which Shawn or Jeremiah owed him. Additionally, Shawn, at the very least, had the lawful right to use reasonable force in protecting his property under K.S.A. 2016 Supp. 21-5225, and Ladish has not alleged that Shawn's use of force was unreasonable.

Shawn's and Jeremiah's actions were not an intervening cause which broke the chain of causality. An intervening cause may absolve a defendant of criminal responsibility but only if it was not foreseeable. *State v. Anderson*, 270 Kan. 68, 76-77, 12 P.3d 883 (2000). In criminal cases, a victim's or third party's act will cut off criminal liability only if it is the sole legal cause of harm. See *State v. Kirby*, 272 Kan. 1170, 1183, 39 P.3d 1 (2002) ("[A] defendant will be found not responsible for the death which occurs during the commission of a felony only if an extraordinary intervening event supersedes the defendant's act and becomes the sole legal cause of death."); *State v. Bale*, 39 Kan. App. 2d 655, 661, 182 P.3d 1280 (2008) ("Contributory negligence is not a defense to involuntary manslaughter. Nevertheless, a victim's own conduct may be so substantial a factor so as to be the direct cause of death.").

Here, Ladish had stolen Shawn's truck and was driving it within the vicinity of where he had stolen it. It was foreseeable that the owner of the truck would see the stolen vehicle and take measures to recover it. See *Romero*, 2012 WL 2924537 at *10

(concluding that "someone taking a car without the permission of the owner reasonably might anticipate the owner would intervene in some manner to prevent the loss"). It was also foreseeable that a friend or relative might assist the owner out of concern for his safety.

The evidence also does not establish that Shawn's and Jeremiah's actions were the sole legal cause of harm. While they did confront the driver of the truck, this action was proceeded by the theft of the truck and succeeded by the driver's decision to drive the car erratically while Shawn and Jeremiah were still holding on. Thus, Shawn's and Jeremiah's actions do not constitute an intervening cause which prevents Ladish from being criminally responsible.

Even if a proximate cause instruction had been legally and factually appropriate, Ladish cannot establish clear error. In evaluating whether an instruction rises to the level of clear error, the issue of "[r]eversibility is subject to unlimited review and is based on the entire record. It is the defendant's burden to establish clear error under K.S.A. 22-3414(3). [Citation omitted.]" *State v. Betancourt*, 299 Kan. 131, 135, 322 P.3d 353 (2014). The clear error determination must review the impact of the erroneous instruction in light of the entire record including the other instructions, counsel's arguments, and whether the evidence is overwhelming. *In re Care & Treatment of Thomas*, 301 Kan. 841, 849, 348 P.3d 576 (2015).

As the State points out, other jury instructions covered the issue of proximate cause. The jury instruction on second-degree murder stated the jury must find that Ladish killed Shawn. The use of the word "killed" adequately expresses the requirement that Ladish's acts must have been the proximate cause of Shawn's death. *Bale*, 39 Kan. App. 2d at 660. Citing the rule in *Bale*, our Supreme Court in *State v. McCarley*, 287 Kan. 167, 239, 195 P.3d 230 (2008), found the district court did not commit clear error in failing to give a proximate cause instruction for an aggravated battery offense when the court

21

instructed the jury it must find the defendant's actions recklessly caused great bodily harm.

Additionally, Ladish did not rely on this theory as part of his defense at trial. Rather, he argued that he was not the one in the truck. Alternatively, he argued that if he was in the truck, he was only guilty of a lesser-included offense. As Owens reasoned in closing arguments, the driver of the truck panicked when he was confronted by Shawn and Jeremiah, so he could not make a conscious decision to disregard a substantial and unjustifiable risk to their safety. Ladish never claimed at trial that Shawn and Jeremiah were directly responsible for the harm they sustained.

Finally, giving a proximate cause instruction would almost certainly have been inconsequential to the verdict based on the evidence presented at trial. A reasonable jury could not have concluded the driver's decision to steal the truck or drive the truck erratically while Shawn and Jeremiah held on had nothing to do with the harm they sustained. See *Romero*, 2012 WL 2924537 at *11 (finding no reasonably jury could find the victim's attempts to prevent the defendant from stealing her car were the sole cause of her injury). Thus, the district court did not commit clear error by failing to give a proximate cause instruction.

Affirmed.